# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Statesboro Division

|  |  |
|---|---|
| ) | **FILED** |
| ) | **Lucinda B. Rauback, Clerk** |
| ) | **United States Bankruptcy Court** |
| ) | **Savannah, Georgia** |
| ) | ***By DReese at 3:57 pm, Nov 21, 2019*** |
| In re: ) | |
| ) | |
| ENVIRONMENTAL WOOD ) | |
| PRODUCTS, INC., ) | |
| ) | |
| *Debtor.* ) | Chapter 11 |
| _____ ) | |
| ) | |
| RENASANT BANK, succesor-in-interest to ) | Number <u>10-60477-EJC</u> |
| Heritage Bank of the South, and ) | |
| HALL & NAVARRO, LLC, ) | |
| ) | |
| Movants, ) | |
| ) | |
| v. ) | |
| ) | |
| ENVIRONMENTAL WOOD ) | |
| PRODUCTS, INC., ) | |
| ) | |
| Respondent. ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |

## OPINION ON MOTION TO REOPEN CHAPTER 11 CASE

### I. Introduction

This Chapter 11 case was closed eight years ago, on September 21, 2011, after

the Court confirmed the plan of reorganization filed by the Debtor, Environmental Wood

Products, Inc. Since that time, the Debtor has made all of its scheduled plan payments to both secured and unsecured creditors. To all appearances, the plan seems to have succeeded. But at some point, the Debtor's principal, Donald R. Warren, came to believe that the Debtor's largest creditor, Renasant Bank, was misapplying the Debtor's payments. Further, Mr. Warren alleges that the Debtor's former counsel, J. Michael Hall of Hall & Navarro, LLC ("Hall & Navarro"), somehow agreed to this misapplication of payments. On May 13, 2019, the Debtor sued both Renasant Bank and Hall & Navarro in the Superior Court of Tattnall County, Georgia. The Debtor asserted a claim of professional malpractice against Hall & Navarro, as well as a claim of conversion against Renasant Bank based on its alleged scheme to defraud the Debtor.

Not long after the state court action was filed, each defendant removed that action to the United States District Court for the Southern District of Georgia. Confusingly, this procedure resulted in two separate cases in the District Court. Both of those cases have now been assigned to a single District Court judge. For their part, both Renasant Bank and Mr. Hall asserted in the District Court that removal was proper pursuant to 28 U.S.C. § 1452(a) because the underlying civil action involved the court's bankruptcy jurisdiction. Both defendants have now jointly moved this Bankruptcy Court to reopen this long-closed bankruptcy case so that the Court "may hear and determine the causes of action asserted in the Complaint." (Dckt. 137, p. 7). To that end, they contend that the Bankruptcy Court is in the best position to "interpret" the confirmation order entered in the bankruptcy case. The Debtor, which is the plaintiff in the civil action, opposes the reopening of the bankruptcy case. A hearing was held in this matter on August 21, 2019. For the reasons set forth below,

2

the Court will deny, without prejudice, the joint motion to reopen.

## II. The Underlying Chapter 11 Case

The Debtor, a wood manufacturing company, filed a Chapter 11 petition on May 28, 2010. (Dckt. 1). On June 8, 2010, the Court entered an Order appointing Mr. Hall as counsel for the Debtor. (Dckt. 21). On September 23, 2010, the Debtor's principal creditor, HeritageBank of the South ("HeritageBank"), filed a proof of claim (Claim No. 11) in the amount of $1,361,318.50.[1] According to the proof of claim, the value of HeritageBank's collateral was $842,180.00. (Claim 11-2, p. 1). Thus, in accordance with the bifurcation provision of 11 U.S.C. § 506(a)(1),[2] HeritageBank held a secured claim in the amount of $842,180.00 and an unsecured claim in the amount of $519,138.50. (Claim 11-2, p. 1).[3]

On November 19, 2010, the Debtor filed its Plan of Reorganization. (Dckt. 57). The Debtor amended its plan on December 22, 2010 (the "Second Plan of Reorganization").

---

[1] HeritageBank filed an amended proof of claim (Claim 11-2) on the following day, September 24, 2010, for the same amount, but with a corrected description of the loans comprising the claim. (Claim 11-2, pp. 2-4).

[2] Section 506(a)(1) provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). In other words, "under section 506(a)(1), a creditor has a secured claim only up to the value of the collateral securing the claim; the rest is unsecured." *In re Garrett*, 494 B.R. 336, 343 (Bankr. N.D. Ill. 2013).

[3] As will be discussed below, HeritageBank had a single claim in the case, but it was based on two loans, one of which was guaranteed by the Small Business Administration and one of which was not.

3

(Dckt. 63). HeritageBank filed an objection (dckt. 76) to the Second Plan of Reorganization on January 25, 2011, asserting, among other things, that the Debtor's plan failed to properly value HeritageBank's collateral. (Dckt. 76, p. 2).

On March 21, 2011, the Court entered its Consent Order Resolving HeritageBank of the South's Objection to Confirmation of the Debtor's Second Plan of Reorganization (the "Consent Order"). (Dckt. 102). Under the terms of the Consent Order, it was established that HeritageBank had an allowed secured claim in the amount of $757,000.00 and an allowed unsecured claim in the amount of $604,318.50. (Dckt. 102, p. 1). The Consent Order required the Debtor to pay HeritageBank's secured claim "in 147 payments of $6,522.36 with interest accruing at the rate of four percent (4%) per annum with the first payment beginning on March 1, 2011 and continuing on the first day of each month thereafter until HeritageBank's Secured Claim is paid in full[.]" (Dckt. 102, p. 2). HeritageBank's unsecured claim, on the other hand, was to be paid as a Class 9 general unsecured creditor claim under the Debtor's Second Plan of Reorganization, which provided for a 15% dividend to be paid to Class 9 creditors at an interest rate of 4 percent amortized over a five-year period. (Dckt. 63, p. 2; dckt. 102, p. 3). The terms of the Consent Order were incorporated into the order confirming the Debtor's Second Plan of Reorganization, and, to the extent conflicting with the plan, were ordered to take precedence over the terms of the plan. (Dckt. 102, p. 4).

The Court entered an Order confirming the Debtor's Second Plan of Reorganization ("Confirmation Order") (dckt. 124) on May 13, 2011. Under the terms of that Order, the only reference to the Court's continued jurisdiction was the statement that

4

"[n]otwithstanding any contrary provision of the plan, this Court does not retain jurisdiction to adjudicate claims against the Debtor arising out of a breach of the terms of the confirmed plan. (Dckt. 124). Following the entry of the Debtor's Chapter 11 Final Report (dckt. 132) on July 28, 2011, the Court entered its Chapter 11 Final Order (dckt. 133) on September 21, 2011, and closed the case on that same date.

## III. The Debtor's Post-Confirmation Payments Under the Plan

Subsequently, HeritageBank merged with Renasant Bank. As the surviving entity, Renasant Bank acquired the rights and interests of HeritageBank, including the right to payment by the Debtor. (Tr. at p. 66).[4] Regarding the unsecured debt, consistent with the requirements of the Second Plan of Reorganization (dckt. 63) as modified by the Consent Order (dckt. 102), the Debtor made five consecutive annual payments to Renasant Bank in the amount of $20,362.00; those payments were made on June 13, 2012; June 13, 2013; June 13, 2014; June 13, 2015; and June 13, 2016. (Ex. "Ren-5," p. 34).[5] Thus, the Debtor's unsecured debt to Renasant Bank was paid in full, a fact that is not in dispute. (Tr. at pp. 105-111).

As for the secured debt, which the Consent Order required to be paid in the amount of $6,522.36 per month for 147 months, a payment history prepared by Renasant

---

[4] This designation shall refer to the transcript of the August 21, 2019 hearing, available at Dckt. 152.

[5] This designation shall refer to exhibits admitted into evidence at the August 21, 2019 hearing. An exhibit log appears at Dckt. 150. Copies of two of these exhibits, Renasant Bank's payment history and the Complaint in the civil action, are attached to Dckt. 135.

Bank indicates that the Debtor has made every scheduled monthly payment from March 3, 2011 through August 7, 2019.[6] (Ex. "Ren-4"; Tr. at pp. 73-79; Dckt. 137 at pp. 10-13). In addition to these monthly payments, the Debtor sold certain collateral, consisting of 2.11 acres of real property, and the $69,666.17 in proceeds were applied to the principal balance of the secured claim on July 19, 2018. (Ex. "Ren-4," p. 4; Tr. at pp. 81-82, 98). As a result, the secured claim will actually be paid out slightly ahead of schedule. (Tr. at pp. 102-03).

   The secured claim payments enumerated on the payment history prepared by Renasant Bank are identical to those listed in a separate payment history prepared by the Debtor's accountant and attached to a letter dated August 30, 2018. (Ex. "Ren-5," pp. 42-45; Tr. at pp. 79-82). There are only two differences between these two documents. First, the Debtor's accountant included seven monthly "adequate protection" payments,[7] each in the

---

  [6] The first twelve payments were each made in the amount of $6,500.00 instead of the required $6,522.36. To correct for these short payments, the Debtor made a catchup payment of $268.32, which did not include any penalties or additional interest, on February 7, 2012. (Ex. "Ren-4," p. 1; Tr. at p. 97). The payment history also indicates that beginning on December 2, 2013, and ending on October 9, 2018, the Debtor made its monthly payments in the form of two separate checks: one in the amount of $3,978.64 and one in the amount of $2,543.72, which total $6,522.36. (Ex. "Ren-4," pp. 1-4; Tr. at pp. 87-88).

  [7] "The Bankruptcy Code provisions concerning stay relief and adequate protection are straightforward. During the pendency of a bankruptcy case, the automatic stay under § 362(a) prevents secured creditors from exercising their usual state law contractual and statutory remedies upon a debtor's default . . . . Congress offers a secured creditor two alternatives in the Bankruptcy Code when it perceives that its collateral may be declining in value during a bankruptcy case: it may seek relief from the automatic stay under § 362(d), or it may seek adequate protection under § 363(e)." *People's Capital and Leasing Corp. v. Big3D, Inc. (In re Big3D, Inc.)*, 438 B.R. 214, 220 (B.A.P. 9th Cir. 2010). "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy." *In re TeVoortwis Dairy, LLC*, 605 B.R. 833, 839 (Bankr. E.D. Mich. 2019) (quoting *Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987)). Adequate protection may take the form of cash payments, additional or replacement liens, or the "indubitable equivalent" thereof. 11 U.S.C. § 361.

6

amount of $6,000.00, made from July of 2010 through February of 2011 pursuant to two cash collateral orders entered in the bankruptcy case. (Dckt. 31 & 62, Tr. at pp. 82-84). These seven payments predated the agreed amount of HeritageBank's secured claim for which payments began in March of 2011. (Dckt. 31, p. 4; dckt. 62, p. 4). Second, the Debtor's accountant did not include the $69,666.17 in proceeds from the sale of the real estate. (Tr. at p. 81).

## IV. The Allocation of Payments Between the SBA and Non-SBA Loans

All of the foregoing facts are both straightforward and undisputed. The problem, however, arose because the claim filed by HeritageBank, and now held by Renasant Bank, was comprised of two different loans, one of which was guaranteed by the Small Business Administration (the "SBA Loan") and one of which was not (the "Non-SBA Loan"). Specifically, the SBA Loan originated on February 9, 2000, when Ronald P. Warren (now deceased)[8] and Donald R. Warren executed a Small Business Administration Note in the original principal amount of $790,000.00. (Ex. "Ren-1," pp. 35-40). In connection with the note, the Warrens further executed a Deed to Secure Debt conveying to The Tattnall Bank[9] approximately ten acres of real property as security for the SBA Loan as well as for "any and all other indebtedness" then or thereafter owing by Donald or Ronald Warren. (Ex. "Ren-1," pp. 41-44). Also on February 9, 2000, the Debtor executed an Unconditional

---

[8] (Tr. at p. 7).

[9] HeritageBank subsequently obtained both the SBA Loan and the Non-SBA Loan from The Tattnall Bank. (Tr. at p. 68).

Guarantee of the SBA Loan in favor of the SBA. (Ex. "Ren-1," pp. 30-34). At the time HeritageBank filed its amended proof of claim on September 24, 2010, the amount owing on this SBA Loan was $490,575.98.[10] (Claim 11-2, pp. 3-4; Tr. at pp. 67-70).

The Non-SBA Loan, on the other hand, originated on August 28, 2008, when the Debtor, acting through its principals, the Warrens, executed in favor of The Tattnall Bank a promissory note in the original principal amount of $874,455.12. (Ex. "Ren-1," p. 5; Tr. at p. 72). As collateral for the Non-SBA Loan, the Debtor granted The Tattnall Bank a security interest in accounts and other rights to payment, inventory, equipment, and deposit accounts. (Ex. "Ren-1," p. 6). The Debtor also executed a Deed to Secure Debt conveying to The Tattnall Bank two acres of real property as additional collateral for the Non-SBA Loan. (Ex. "Ren-1," p. 19). Both Donald and Ronald Warren executed a Guaranty in favor of The Tattnall Bank, guarantying payment of the Non-SBA Loan. (Ex. "Ren-1," p. 28). By virtue of the Guaranty, the ten-acre tract securing the SBA Loan and "any and all other indebtedness" of the Warrens became security for the Non-SBA Loan, as well. At the time HeritageBank filed its amended proof of claim, the amount owing on this Non-SBA Loan was $870,742.52.[11] (Claim 11-2, pp. 2-3).

On May 20, 2010, eight days before this bankruptcy case was filed, the Debtor acquired from the Warrens title to the ten-acre tract that by this point secured both the SBA

---

[10] The SBA was not listed on the creditor mailing matrix (dckt. 7) or in the Debtor's schedules (dckt. 1, pp. 12-17) and did not enter an appearance in the bankruptcy case.

[11] Thus, HeritageBank's proof of claim (Claim No. 11) was in the total amount of $1,361,318.50, which was comprised of the $490,575.98 owing on the SBA Loan and the $870,742.52 owing on the Non-SBA Loan.

Loan and the Non-SBA Loan. (Ex. "Ren-1," pp. 41-44). By virtue of this transfer, at the time the petition was filed, HeritageBank held a single claim based on two separate loans (the SBA Loan and the Non-SBA Loan). Because the total value of all collateral that secured both loans was less than the combined balances of both loans, this claim was partially secured and partially unsecured. (Tr. at pp. 7-9, 89).

Neither the Debtor's Second Plan of Reorganization (dckt. 63, confirmed at dckt. 124), nor the Consent Order (dckt. 102), nor any other order entered in the bankruptcy case provided for an allocation of the Debtor's monthly payments of $6,522.36 between the SBA Loan and the Non-SBA Loan portions of the secured claim filed by HeritageBank and now held by Renasant Bank. Nor was such an allocation necessary under the Bankruptcy Code to confirm the plan. As long as the secured portion of the claim was properly identified and provided for separately under the plan, it was not important which part of that secured claim was guaranteed by the SBA.

Nevertheless, that allocation of the secured claim payments of $6,522.36 per month became the subject of discussion, about a year after the case was closed, between Mr. Hall and counsel for HeritageBank. The SBA, which acts as a sort of insurer of SBA loans, promulgates strict guidelines that a bank must follow to receive the benefit of the SBA's guarantee. (Tr. at p. 89).[12] To remain in compliance with these guidelines, HeritageBank grew concerned about how to allocate the Debtor's payments between the SBA and the non-

---

[12] Here, the record contains no indication that the SBA was ever called upon by HeritageBank or Renasant Bank to make good for any default on the Debtor's part. *See* (Tr. at p. 13).

9

SBA portions of its secured claim, fearing that the SBA would penalize HeritageBank if the allocation was more favorable to the non-SBA portion than to the SBA portion. (Tr. at pp. 90-91). Consequently, in late 2013, HeritageBank sought guidance from the Debtor's counsel, Mr. Hall, who suggested a certain allocation.[13] (Tr. at pp. 88, 90).

Specifically in a letter dated August 30, 2012, Mr. Hall requested, among many other things, that HeritageBank "retroactively apply $2,544.11 of each monthly payment previously received and each monthly payment which will be received in the future to the SBA Loan secured claim." (Ex. "Ren-15," pp. 41-42; Dckt. 137 at pp. 55-56). Notably, it is not clear whether Mr. Hall wrote this letter in his capacity as counsel for the Debtor or for both Warrens or for Ronald Warren alone. It is alleged the Debtor's principals were not consulted on this matter by Mr. Hall. In any event, counsel for HeritageBank responded to one of Mr. Hall's requests in a letter dated October 30, 2013, stating as follows:

> This letter is to follow up upon your letter dated August 30, 2012, concerning a request by Environmental Wood Products, Inc. to retroactively allocate $2,544.11 of the monthly Plan payments to the SBA Loan and the remaining portion to the HeritageBank of the South ("HeritageBank") secured claim. HeritageBank has forwarded your client's request to the SBA, but has not received an acceptance or a rejection of the proposal. Although it has not received a response, HeritageBank is retroactively applying the payments in a manner consistent with the August 30, 2012 request. The purpose of this letter is to notify your client of the adjustment to the outstanding balances of the separate loans with HeritageBank.

(Ex. "Ren-15," p. 40; Dckt. 137 at pp. 54). The only documents in the record that reflect the

---

[13] This internal bookkeeping between Heritage Bank (later Renasant Bank) and the SBA did not impact the *amount* of the Debtor's payments nor the secured vs. unsecured status of the claim. And, as mentioned previously, the Debtor's payments on the unsecured part of the claim was made annually pursuant to the 15% distribution to all unsecured creditors set forth in the confirmed plan.

discussions between Mr. Hall and counsel for HeritageBank are these two letters and a few emails. Importantly, despite the breadth of matters alluded to in Mr. Hall's letter of August 30, 2012, HeritageBank's response is limited to the allocation of the monthly payments. Consistent with their apparent agreement, beginning in December of 2013, the Debtor began making two separate payments, one in the amount of $3,978.64 to the Non-SBA portion of the debt and one in the amount of $2,543.72 to the SBA portion, which total $6,522.36. (Ex. "Ren-4," pp. 1-4; Tr. at pp. 87-88).

## V. The Civil Action

Eventually, the Debtor's principal, Donald Warren, became aware[14] of the allocation being made pursuant to Mr. Hall's guidance. On May 13, 2019, nearly eight years after the bankruptcy case was closed, the Debtor filed a Complaint against Mr. Hall's firm, Hall & Navarro, and against Renasant Bank in the Superior Court of Tattnall County, Georgia, commencing Civil Action No. SUV20199000089 (the "civil action"). (Ex. "Ren 15"). According to the Complaint, "[o]n August 30, 2012, Mr. Hall wrote a letter to the Bank authorizing the Bank to split [the Debtor's] $6,000 payments, including past and future payments, between the above-mentioned secured debt and some other debt, in contravention of the above-described Consent Order . . . . Hall did this without the consent of any agent or employee of [the Debtor] and copied no one at [the Debtor] on his letter." (Ex. "Ren-15," p. 2, ¶ 11). The Complaint further alleges that "as a result of the Bank splitting the payments

---

[14] It is unclear from the record why the use of two checks beginning in December of *2013* would not have alerted the Warrens to the allocation being made.

and EWP for years not knowing about the split, EWP is hundred [sic] of thousands of dollars behind on its payment of the secured debt."[15] (Ex. "Ren-15," p. 3, ¶ 14).

Based on these allegations, the Debtor asserted a professional malpractice claim against Hall & Navarro, pursuant to the doctrine of respondeat superior, for "purporting to change the Court-ordered terms of EWP's relationship with the Bank without the consent or knowledge of anyone at EWP[.]" (Ex. "Ren 15," p. 4). The Debtor further asserted a claim against Renasant Bank for conversion, alleging that "[t]he Bank's fraudulent scheme caused EWP to pay money that, but for the Bank's fraudulent and deceitful representations, EWP would not have paid." (Ex. "Ren 15," p. 4).

In response to the Complaint, on June 20, 2019, each defendant filed a Notice of Removal, pursuant to 28 U.S.C. § 1452(a) and Rule 9027 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), removing the case from the Superior Court of Tattnall County to the United States District Court for the Southern District of Georgia. (Ex. "Ren-18").[16] For reasons that are not entirely clear, this removal procedure resulted in two cases before the District Court.[17] (Tr. at pp. 22-23). The final paragraph of Renasant Bank's

---

[15] These allegations are not supported by the limited record made at the August 21, 2019 hearing. Specifically, there was no evidence of any "other debt" to which Renasant Bank applied the Debtor's monthly payments on the secured debt. Nor was there any evidence that the Debtor is behind on its payments. To the contrary, the secured debt is due to be paid off ahead of schedule after applying the proceeds from the sale of real estate.

[16] Only Renasant Bank's Notice of Removal is in the record before this Court. Hall & Navarro's Notice of Removal is available at Dckt. 1 in Case No. 6:19-cv-00056-JRH-CLR.

[17] The two cases are Case No. 6:19-cv-00056-JRH-CLR, originally assigned to Judge R. Stan Baker and subsequently reassigned to Judge J. Randal Hall, and Case No. 6:19-cv-00057-JRH-CLR, assigned to Judge Hall. Motions to consolidate the cases are currently pending. (Case No. 6:19-cv-00056-JRH-CLR, dckt. 9; Case No. 6:19-cv-00057-JRH-CLR, dckt. 13). Both defendants are named in both cases.

Notice of Removal, entitled "Consent to Jurisdiction and Request for Referral," states as follows:

> Upon removal of the causes of action asserted against Renasant in the State Court Action, Renasant does consent to entry of final orders or judgment by the U.S. Bankruptcy Court for the Southern District of Georgia. Further, Renasant requests that, upon removal, this matter be referred to the Bankruptcy Court.

(Ex. "Ren-18," p. 5).[18] A motion to remand to state court was filed by the Plaintiff/Debtor in Case No. 6:19-cv-00057-JRH-CLR and remains pending.[19]

## VI. The Motion to Reopen

On July 3, 2019, Renasant Bank and Hall & Navarro (collectively, the "Movants") filed in this Court the instant Joint Motion to Reopen Bankruptcy Case ("Motion to Reopen") pursuant to 11 U.S.C. § 350(b). (Dckt. 135, 137).[20] In the motion, these parties request that the Court reopen this Chapter 11 case "in order to hear and adjudicate causes of action having recently been asserted by [the Debtor] against the Movants falsely alleging that Renasant Bank . . . has refused to comply with an Order of this Court entered in the Bankruptcy Case . . . and that [the Debtor's] then retained counsel in the Bankruptcy Case committed professional malpractice in authorizing Renasant to do so." (Dckt. 137, pp. 1-2). In support of this request, the motion states that "adjudication of these causes of action

---

[18] Hall & Navarro's Notice of Removal does not contain such a request. (Case No. 6:19-cv-00056-JRH-CLR, dckt. 1).

[19] *See* dckt. 8 & 20 in Case No. 6:19-cv-00057-JRH-CLR.

[20] Following a deficiency notice (dckt. 136), an amended motion (dckt. 137) was filed on July 9, 2019.

requires and depends upon interpretation of this Court's own orders entered in the Bankruptcy Case and involves the propriety of services performed for [the Debtor] by a Court-appointed professional," and thus "this Court is best suited to hear and determine the causes of action." (Dckt. 137, p. 2).

The Debtor filed a response in opposition (dckt. 141) to the Motion to Reopen on July 17, 2019, asserting that "[t]he Superior Court of Tattnall County is the only appropriate forum to resolve [the Debtor's] claims against Defendants[.]" (Dckt. 141, p. 2). Although the Debtor acknowledges that the orders entered in this bankruptcy case are "relevant to Plaintiff's action against Defendants," the Debtor contends that "any court can interpret" those orders. (Dckt. 141, p. 3). The Debtor asserts that the Motion to Reopen is without merit because "[t]here is nothing left for this Court to adjudicate" and that "[t]he matters Defendants want this Court to decide are claims for legal malpractice and conversion, not for any relief in Bankruptcy Court." (Dckt. 141, pp. 3-4).

This matter came on for hearing on August 21, 2019. After hearing argument from counsel, the Court heard testimony from Clark Blackwell, Renasant Bank's Vice President and Special Assets Officer, for the limited purpose of deciding the Motion to Reopen.[21] (Tr. at p. 65). Twenty exhibits were admitted into evidence. *See* Exhibit Log

---

[21] The Court is mindful that "[d]ue to the limited nature of a proceeding to reopen a case . . . the Court's decision to reopen is not an adjudication on the substantive issues raised by the moving party and 'determines nothing with respect to the merits of the case.'" *In re Kim*, 566 B.R. 9, 12 (Bankr. S.D.N.Y. 2017) (quoting *In re Menk*, 241 B.R. 896, 913 (B.A.P. 9th Cir. 1999)). *See also In re Oglesby*, 519 B.R. 699, 703 (Bankr. N.D. Ohio 2014) (Reopening a case "affords no independent relief, but merely gives a bankruptcy court the opportunity to act on a substantive request for relief."). *See also* the thoughtful discussion of this issue in *In re OORC Leasing, LLC*, 359 B.R. 227 (Bankr. N.D. 2007).

(Dckt. 150); (Tr. at pp. 61, 74-79, 112-13). At the conclusion of the hearing, the Court took under advisement the Motion to Reopen, which is now ripe for ruling.

## VII. Jurisdiction

This Court has subject-matter jurisdiction to rule on the Motion to Reopen pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), which states that "matters concerning the administration of the estate" are core proceedings. 28 U.S.C. § 157(b)(2)(A). As will be discussed below, however, other jurisdictional issues will be implicated if this case is reopened.

## VIII. Legal Standard for Motion to Reopen Under Section 350(b)

Bankruptcy Rule 5010 provides that "[a] case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code." Fed. R. Bankr. P. 5010. Section 350(b), in turn, authorizes courts to reopen closed cases "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). Here, Renasant Bank and Hall & Navarro have jointly moved to reopen the Debtor's Chapter 11 case, asserting that cause to reopen exists based on the necessity of having this Court interpret its own prior orders that are relevant in the civil action between the parties. As the Movants, Renasant Bank and Hall & Navarro have the burden of establishing that this case should be reopened pursuant to § 350(b). *See In re Dicks*, 579 B.R. 704, 708 (Bankr. E.D.N.Y. 2017).

15

"The Code does not define 'other cause,' and the decision to reopen is discretionary." *In re Easley-Brooks*, 487 B.R. 400, 406 (Bankr. S.D.N.Y. 2013) (quoting *In re Cruz*, 254 B.R. 801, 804 (Bankr. S.D.N.Y. 2000)). *See also In re Judson*, 586 B.R. 771, 772 (Bankr. C.D. Cal. 2018) ("Bankruptcy courts have broad discretion to determine whether to reopen a case."). "The question of whether to reopen 'depends upon the circumstances of the individual case.'" *In re Pinks*, 531 B.R. 114, 117 (Bankr. D.S.C. 2015) (citing *In re Paul*, 194 B.R. 381, 383 (Bankr. D.S.C. 1995)). To determine whether cause exits to reopen a case, the bankruptcy court "may consider numerous factors including equitable concerns, and ought to emphasize substance over technical considerations." *In re Kim*, 566 B.R. 9, 12 (Bankr. S.D.N.Y. 2017) (quoting *Easley-Brooks*, 487 B.R. at 406-07). Some factors courts consider include:

> (1) the length of time that the case was closed;
>
> (2) whether a nonbankruptcy forum has jurisdiction to determine the issue that is the basis for reopening the case;
>
> (3) whether prior litigation in the bankruptcy court determined that another court would be the appropriate forum;
>
> (4) whether any parties would suffer prejudice should the court grant or deny the motion to reopen;
>
> (5) the extent of the benefit to *any party* by reopening; and
>
> (6) whether it is clear at the outset that no relief would be forthcoming if the motion to reopen is granted.

*Id.* (quoting *In re Atari, Inc.*, No. 13-10176 (JLG), 2016 WL 1618346, at *4-5 (Bankr. S.D.N.Y. Apr. 20, 2016) (emphasis in original)).

## IX. Relevant Factors

Having considered all the facts and circumstances, the Court finds that cause does not exist to reopen the Debtor's Chapter 11 case at this time. Two of the factors set forth above support this conclusion. First, nearly eight years elapsed between the closing of the case and the filing of the Motion to Reopen. "As the time between closing of the estate and its reopening increases, so must also the cause for reopening increase in weight." *In re Geo Specialty Chem. Ltd.*, 577 B.R. 142, 179 (Bankr. D.N.J. 2017) (quoting *Stackhouse v. Plumlee (In re Plumlee)*, 236 B.R. 606, 610 (E.D. Va. 1999)). *See also In re Redmond*, 380 B.R. 179, 190 (Bankr. N.D. Ill. 2007) (quoting *In re Nylon Net Co.*, 225 B.R. 404, 405 (Bankr. W.D. Tenn. 1998) ("It is well settled that the greater the elapse of time between the closing of the bankruptcy case and the request to reopen, the more compelling the reason for reopening the case should be."). Although some courts have reopened cases closed for seven years or more, "they are the exception, by far, and not the rule." *In re Lovell*, No. 08-11204, 2016 WL 2865359, at *2 (Bankr. D. Me. May 11, 2016). *See also In re Fansteel, Inc.*, No. 02-10109 (KJC), 2017 WL 3822724, at *5 (Bankr. D. Del. Aug. 28, 2017) ("Courts have denied reopening cases when the amount of time since the case had been closed is far less than seven years."). Thus, the first factor, the length of time that this case has been closed, weighs against reopening.

Second, the civil action filed by the Debtor against the Movants remains pending in another forum, namely the District Court. "[T]he availability of relief in an alternative forum is a permissible factor on which to base a decision not to reopen a closed

17

bankruptcy case." *In re Davis*, 604 B.R. 807, 809 (Bankr. E.D. Ark. 2019). *See also In re HBLS, L.P.*, 468 B.R. 634, 639 (Bankr. S.D.N.Y. 2012) ("Courts routinely decline to exercise their discretion to reopen bankruptcy cases where the parties are seeking or could seek relief in a competent alternative forum."). This factor, therefore, also weighs against reopening the case.

Although the above-mentioned factors enumerated by other courts are helpful, "the court's evaluation of the numerous potentially relevant considerations is not a mechanical or mathematical exercise. The court need not plod through a discussion of each factor in the laundry lists developed in prior decisions." *In re Janssen*, 396 B.R. 624, 636 (Bankr. E.D. Pa. 2008). As some courts have observed, "'the wise exercise of discretion is rarely a matter of score-keeping or bean-counting. Ultimately, the pursuit of "equit[y]," "justice" and "comity" involves a thoughtful, complex assessment of what makes good sense in the totality of the circumstances.'" *Id.* (quoting *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. Partnership*, No. 04 Civ. 708(GEL), 2004 WL 1048239, at *3 (S.D.N.Y. May 7, 2004)). To that end, the instant Motion to Reopen requires a pragmatic exploration of what would happen if this bankruptcy case is reopened.

## X. The Movants' Proposal

In their Motion to Reopen, the Movants request, vaguely, that "the Bankruptcy Case be reopened so that [the Bankruptcy Court] may hear and determine the causes of action [i.e. legal malpractice and conversion] asserted in the Complaint" that commenced the civil action. (Dckt. 137, p. 7). This request was clarified somewhat at the August 21, 2019

hearing. There, counsel for the Movants stated that upon the reopening of the bankruptcy case, they would file a motion in the District Court seeking referral of the civil action to the Bankruptcy Court. (Tr. at p. 24-27). Upon referral, they would file an adversary proceeding pursuant to Bankruptcy Rule 7001(2), which provides that "a proceeding to determine the validity, priority, or extent of a lien and other interest in property" requires an adversary proceeding to be filed. Fed. R. Bankr. P. 7001(2).

The purpose of such adversary proceeding would be for the Bankruptcy Court to"interpret" the confirmed plan and the Consent Order. (Tr. at pp. 25-27, 29, 34). Such interpretation, the Movants suggest, would take the form of proposed findings of fact and conclusions of law concerning the extent of Renasant Bank's lien. This would include a determination of the "proper" allocation of payments between the SBA and non-SBA portions of the secured claim under the terms of the confirmed plan and the Consent Order. (Tr. at pp. 11, 24, 29-31, 117, 121). As counsel for Renasant Bank asserted at the August 21, 2019 hearing, the Court would have to determine whether the Consent Order required any of the payments on the secured debt to be allocated toward the SBA portion of the claim. (Tr. at p. 130). At that same hearing, counsel for Hall & Navarro asserted that "[w]e need to have a mechanism, because this isn't addressed in the consent order, of how these payments get applied." (Tr. at pp. 36-38).

The Movants anticipate that the Court would find that the allocation suggested by Mr. Hall and implemented by Renasant Bank did not violate the terms of either the confirmed plan or the Consent Order. In turn, the Court's proposed findings and conclusions would be used, somehow, as a basis for dismissing the claims of malpractice and conversion

asserted by the Debtor in the civil action. (Tr. at pp. 25, 32-34, 36-38).

## XI. Federal Subject Matter Jurisdiction

The first problem with the Movants' proposal is that it would be premature for this Court to reopen the bankruptcy case before the District Court rules on the pending motion to remand in the civil action. In deciding whether to remand, the District Court will be required to determine whether it has jurisdiction in the first instance. As mentioned, the Movants each removed the Plaintiff/Debtor's claims against them to the District Court pursuant to 28 U.S.C. § 1452(a), sometimes called the "bankruptcy removal statute." *See Curtis v. Shpak (In re Curtis)*, 571 B.R. 441, 444-45 (B.A.P. 9th Cir. 2017). Like any removal statute, § 1452(a) must "be construed narrowly 'because of the significant federalism concerns implicated,' and 'if federal jurisdiction is doubtful, a remand to state court is necessary.'" *In re Providence Wireless, LLC*, 587 B.R. 858, 863 (Bankr. E.D.N.C. 2018) (quoting *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005)). As the removing parties, the Movants have the burden of establishing that the District Court has jurisdiction. *Id.*

Section 1452, which is entitled "Removal of claims related to bankruptcy cases," was "designed to further Congress's purpose of centralizing bankruptcy litigation in a federal forum." *Curtis v. Shpak (In re Curtis)*, 571 B.R. 441, 444-45 (B.A.P. 9th Cir. 2017). It provides that "[a] party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the

district where such civil action is pending, if such district court has jurisdiction of such claims or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a). Thus, removal of claims under § 1452(a) is proper "*only* if the federal court has jurisdiction under the bankruptcy provisions in 28 U.S.C. § 1334." *In re Eight Adversary Proceedings Removed from State Court by Johnson & Johnson*, 603 B.R. 849, 853 (Bankr. S.D. Fla. 2019) (emphasis added). Thus, "[t]he question . . . is whether there is jurisdiction under 28 U.S.C. § 1334." *First Bank of Dalton v. Manton Family Partnership, LLLP (In re Manton)*, 585 B.R. 630, 636 (Bankr. N.D. Ga. 2018) (Diehl, J.).

Section 1334, in turn, provides that federal district courts "shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). Additionally, district courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Taken together, these two subsections enumerate four types of matters over which the district court has jurisdiction: (1) "cases under" the Bankruptcy Code; (2) proceedings "arising under" the Code; (3) proceedings "arising in" a case under the Code; and (4) proceedings "related to" a case under the Code. *Reynolds v. Behrman (In re Atherotech, Inc.)*, 582 B.R. 251, 257 (Bankr. N.D. Ala. 2017) (quoting *Matter of Wood*, 825 F.2d 90, 92 (5th Cir. 1987)).

The term "cases under" in subsection (a) "refers merely to the bankruptcy petition itself" and thus clearly does not apply in this case. *Id.* Under subsection (b), "'[a]rising under' proceedings are matters invoking a substantive right created by the Bankruptcy Code[.]" *In Matter of Staggs*, 562 B.R. 790, 794 (Bankr. N.D. Ala. 2016) (quoting *Continental Nat'l Bank v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1345 (11th Cir.

21

1999)). In other words, they "'involve a cause of action created or determined by a statutory provision of title 11.'" *Atherotech*, 582 B.R. at 257 (quoting *Wood*, 825 F.2d at 96). "Arising in" proceedings are "'generally thought to involve administrative-type matters[.]'" *Staggs*, 562 B.R. at 794. Such matters arise *only* in bankruptcy cases and "'would have no existence outside of bankruptcy.'" *Atherotech*, 582 B.R. at 257 (quoting *Wood*, 825 F.2d at 97).

"A proceeding 'related to' a case under title 11 is the kind of proceeding with the most tenuous federal jurisdictional basis." *Benitez v. Jarrette Bay Inv. Corp. (In re Nassau Dev. of Village West Corp.)*, 547 B.R. 857, 860 (Bankr. S.D. Fla. 2016). In its seminal case on "related to" jurisdiction, *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784 (11th Cir. 1990), the Eleventh Circuit adopted the test set forth by the Third Circuit in the case of *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), writing:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy. The proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate.

*Lemco*, 910 F.2d at 788 (quoting *Pacor*, 743 F.2d at 994). *See also Toledo*, 170 F.3d at 1345. In other words, "a 'related to' matter is one which does not find its source in the Bankruptcy Code, and could be pursued outside a title 11 case, but which nonetheless bears a connection with the title 11 case sufficient to bring it within federal bankruptcy jurisdiction." *In re British American Ins. Co. Ltd.*, 600 B.R. 890, 894 (Bankr. S.D. Fla. 2019). This standard confers upon the bankruptcy court "an extremely broad grant of jurisdictional authority."

*Talisman Capital Alternative Inv. Fund, Ltd. v. Mouttet (In re Mouttet)*, 493 B.R. 640, 651 (Bankr. S.D. Fla. 2013) (citing *Winchester Glob. Trust Co. v. Entrust NPL, Corp. (In re Ryan)*, 276 F. App'x 963, 966 (11th Cir. 2008)).

It is against this legal backdrop that the District Court will be required to determine whether, pursuant to § 1334 by way of § 1452(a), it has jurisdiction over the claims asserted by the Plaintiff/Debtor in the civil action. Regarding the legal malpractice claim against Hall & Navarro, numerous courts have held that federal "arising in" or "related to" bankruptcy jurisdiction exists over claims for malpractice that took place during a bankruptcy case. *See, e.g., Waleski v. Montgomery, McCracken, Walker & Rhoads, LLP (In re Tronox)*, 603 B.R. 712 (Bankr. S.D.N.Y. 2019). For example, in denying a motion to remand a legal malpractice claim that was removed to district court, the court in *Tronox* emphasized the fact that "the alleged acts of malpractice occurred entirely during the bankruptcy case . . . and there is no allegation that [the defendants] provided services outside of the bankruptcy case." *Id.* at 722. Here, of course, the letter that forms the basis of the malpractice claim was sent by Mr. Hall to HeritageBank after the bankruptcy case was closed. However, there is case law standing for the proposition that "malpractice claims against court-appointed professionals stemming from services provided in the bankruptcy proceeding," as is the case with Mr. Hall, constitute "arising in" proceedings. *Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LCC*, 569 F.3d 485, 489-90 (D.D.C. 2009). And as to the conversion claim against Renasant Bank, the Movants contend, reasonably, that this claims has a close nexus with the bankruptcy proceeding because it involves an alleged violation of the Consent Order and the confirmed plan.

For these reasons, the District Court may find that it has "arising in" or "related to" jurisdiction over the Civil Action under the bankruptcy removal statute. On the other hand, the District Court may exercise its discretion to remand equitably pursuant to 28 U.S.C. § 1452(b), which states that the court to which a claim or cause of action is removed under § 1452(a) "may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b). This subsection provides "'an unusually broad grant of authority' that 'subsumes and reaches beyond all of the reasons for remand under nonbankruptcy removal statutes.'" *Barstad v. Davidson (In re Barstad)*, 580 B.R. 272, 279 (Bankr. D. Mont. 2017) (quoting *McCarthy v. Prince (In re McCarthy)*, 230 B.R. 414, 417 (B.A.P. 9th Cir. 1999)). In any event, that issue is for the District Court, not this Bankruptcy Court, to decide. And until the District Court resolves the pending motion to remand by determining whether to exercise jurisdiction, there is no reason to reopen the bankruptcy case.

## XII. Section 1452(a) Confers Jurisdiction Upon the District Court

Even if the District Court finds that it has jurisdiction over this state law tort case under the bankruptcy removal statute, it does not follow that the Bankruptcy Court must exercise jurisdiction. That is because § 1452(a) states that a party may remove a claim or cause of action, over which § 1334 jurisdiction exists, "to the *district* court for the district where such civil action is pending," not directly to the bankruptcy court. 28 U.S.C. § 1452(a). Although some courts[22] have interpreted Bankruptcy Rule 9027 as allowing removal

---

[22] *See, e.g., Lewis v. Anco Insulations, Inc. (In re Friede Goldman Halter, Inc.)*, 602 B.R. 307, 310 (Bankr. M.D. La. 2019) (noting that the defendant "timely removed [the] suit to

24

to a bankruptcy court,[23] the Court agrees with the holding of Judge Dalis in *In re Calvary Baptist Temple*, No. 10-40754, A.P. No. 10-04054, 2010 WL 6794159 (Bankr. S.D. Ga. Aug. 26, 2010), that the plain language of the statute "require[s] that removal be made to the district court rather than the bankruptcy court in the first instance." *Id.* Once a case is removed to district court under § 1452(a), the bankruptcy court is not automatically required to adjudicate the matter. *See, e.g., Ibarra v. FCA US LLC*, No. DR-19-CV-003-AM/VRG, 2019 WL 5387423, at *5-6 (W.D. Tex. Sept. 11, 2019); Overton v. Chrysler Grp. LLC, No. 2:17-cv-01983-RDP, 2018 WL 847772, at *5 (N.D. Ala. Feb. 13, 2018) (noting that the plaintiff's product liability action "will require the *deciding* court to interpret and potentially implement the Bankruptcy Court's Orders.") (emphasis added).

Here, the Plaintiff/Debtor has demanded a jury trial. (Ex. "Ren-15," p. 5). Counsel for the Debtor reiterated this demand at the August 21, 2019 hearing. (Tr. at pp. 57, 134). Jury trials in this District are conducted by the District Court, not by the Bankruptcy Court. *See Calvary Baptist Temple*, 2010 WL 6794159 at *4 (citing Letter from United States District Court Judge B. Avant Edenfield, dated September 18, 1995, stating that all trials in bankruptcy-related cases must be held before the District Court). Thus, even if federal jurisdiction exists, the result would not be that this Bankruptcy Court would conduct

---

this court in accordance with 28 U.S.C. § 1452(a) and Fed. R. Bankr. P. 9027.").

[23] Rule 9027 provides that "[a] notice of removal shall be filed with the clerk for the district and division within which is located the state or federal court where the civil action is pending." Fed. R. Bankr. P. 9027(a)(1). Rule 9001(3) defines the term "clerk" as the "bankruptcy clerk, if one has been appointed, otherwise clerk of the district court." Fed. R. Bankr. P. 9001(3). Read together, these Rules appear to allow removal directly to a bankruptcy court.

a jury trial in a legal malpractice and conversion case under state law. Rather, the reference would be withdrawn, and the District Court would adjudicate these claims.

## XIII. The Bankruptcy Court's Limited Post-Confirmation Jurisdiction

The Court is particularly concerned about exercising jurisdiction over any aspect of the civil action in light of the existence of a confirmed Chapter 11 plan. Several courts have recognized that in the post-confirmation context, a "more exacting theory" of bankruptcy jurisdiction applies because "there is a 'critical significance to the debtor's emergence from bankruptcy protection.'" *Ibarra*, 2019 WL 5387423, at *2 (quoting *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001)).

Under Chapter 11 of the Bankruptcy Code, bankruptcy courts have limited post-confirmation jurisdiction. Section 1141(b) provides that "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all the property of the estate in the debtor." 11 U.S.C. § 1141(b). "As a result, '[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy court jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Hartley v. Wells Fargo Bank, N.A. (In re Talsma)*, 509 B.R. 535 (Bankr. N.D. Tex. 2014) (quoting *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001)). *See also In re Superior Air Parts, Inc.*, 516 B.R. 85, 95-96 (Bankr. N.D. Tex. 2014).

As some courts put it, "[c]onfirmation of the plan marks the beginning of the

reorganized debtor's new financial life." *In re Good*, 428 B.R. 235, 242-43 (Bankr. E.D. Tex. 2010) (quoting *In re Valley Park Grp., Inc.*, 96 B.R. 16, 24 (Bankr. N.D.N.Y. 1989)). Other courts speak in terms of confirmation ending the debtor's "tutelage" status. *See In re Venuto*, 343 B.R. 120, 126 (Bankr. E.D. Pa. 2006) ("An initial postulate accepted by all courts is that after entry of the confirmation/discharge order in a chapter 11 case, there must come a time when 'the cord' between the reorganized or rehabilitated debtor and the bankruptcy court must be severed.").

Confirmation thus carries certain consequences for the reorganized debtor. "Once a bankruptcy plan is effectuated, all indications from the Code would incline us to treat the reorganized entity as we would any other company." *In re T&A Holdings, LLC*, No. 11-81443, 2016 WL 7105903, at *7 (Bankr. N.D. Ill. Nov. 2, 2016) (quoting *In re Jartran, Inc.*, 886 F.2d 859, 870 (7th Cir. 1989)). Although "the debtor may go about its business without further supervision or approval," it is also "without the *protection* of the bankruptcy court[.]" *Good*, 428 B.R. at 243 (quoting *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991)) (emphasis in original). Based on these principles, courts have criticized the notion that any entity that has been a debtor in Chapter 11 "has eternal access to federal court for all disputes related in some way to the debts handled in the bankruptcy proceeding." *T&A Holdings*, 2016 WL 7105903, at *6 (quoting *In re Zurn*, 290 F.3d 861, 864 (7th Cir. 2002)).

"Because of the bankruptcy court's post-confirmation jurisdictional shrinkage, the party seeking to establish post-confirmation jurisdiction must satisfy two requirements." *In re Ener1, Inc.*, 558 B.R. 91, 96 (Bankr. S.D.N.Y. 2016) (citing *In re General Media, Inc.*, 335 B.R. 66, 73-74 (Bankr. S.D.N.Y. 2005)). "First, the matter must have a close nexus to

the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution or administration of the confirmed plan or incorporated litigation trust agreement. Second, the plan must provide for the retention of jurisdiction over the dispute." *Id.* (quoting *General Media*, 335 B.R. at 73-74). Here, even assuming that some nexus exists between the civil action and the confirmed plan, the Confirmation Order entered in the bankruptcy case states that "[n]otwithstanding any contrary provision of the plan, this Court does not retain jurisdiction to adjudicate claims against the Debtor arising out of a breach of the terms of the confirmed plan." (Dckt. 124). The confirmed plan did not otherwise retain jurisdiction. Thus, the Movants would be unable to establish post-confirmation jurisdiction in this Bankruptcy Court.

## XIV. Constitutional Prohibition of Advisory Opinions

The most significant problem with the Movants' proposal is that, if the District Court does not remand, it is unclear how this Bankruptcy Court would be called upon to participate. As mentioned, the Movants have suggested that if this case is reopened, they would file an adversary proceeding so that this Court could "interpret" the confirmed plan and the Consent Order, including a determination of the "proper" allocation of the secured debt payments.

It is true that pursuant to *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009), a bankruptcy court may be "in the best position to interpret its own orders, and its

interpretation is entitled to substantial deference."[24] *See In re Gawker Media LLC*, 581 B.R. 754, 759-60 (Bankr. S.D.N.Y. 2017). However, jurisdiction to interpret bankruptcy orders is not exclusive to the Bankruptcy Court, nor even to the federal courts. *Lewis v. Anco Insulations, Inc. (In re Friede Goldman Halter, Inc.)*, 602 B.R. 307, 310 (Bankr. M.D. La. 2019). Indeed, the Supreme Court has stated that "[i]t is black letter law . . . that the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction over the cause of action." *Id.* (quoting *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 (1981)).

More importantly, there is nothing for this Court to interpret. Neither the Confirmation Order (dckt. 63, 124) nor the Consent Order (dckt. 102) provided for any allocation between the SBA Loan and the Non-SBA Loan portions of the secured claim. Nor were these Orders required under the Bankruptcy Code, or by any other applicable law, to address such allocation, which was simply an internal accounting matter between HeritageBank (now Renasant Bank) and the SBA that only came to the parties' attention after the plan was confirmed and the case was closed.

The Debtor's Second Plan of Reorganization (dckt. 63), as modified by the Consent Order (dckt. 102) is a model of simplicity. It required the Debtor to pay HeritageBank's secured claim in 147 monthly payments of $6,522.36 beginning on March 1, 2011, and continuing until the claim is paid in full. (Dckt. 102, p. 2). No bankruptcy expertise is required to see what is obvious, namely that the confirmed plan and the Consent

---

[24] For a summary of *Travelers v. Bailey, see In re Superior Air Parts, Inc.*, 516 B.R. 85, 97 n.9 (Bankr. N.D. Tex. 2014).

Order are *silent* as to any allocation of these payments between the SBA Loan and Non-SBA Loan portions of the secured debt. Any court of competent jurisdiction can reach that conclusion. Nor is it at all clear how the Movants would make use in the Civil Action of any proposed findings of fact and conclusions of law that this Bankruptcy Court might issue in a hypothetical adversary proceeding (i.e. a *second* lawsuit).[25]

What the Movants effectively seek is an unconstitutional advisory opinion. Under Article III of the Constitution, the power of the federal courts is restricted to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. A case or controversy requires "'an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Chafin v. Chafin*, 568 U.S. 165, 171-72 (2013) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). In contrast, "[f]ederal courts may not . . . give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). In other words, federal courts, which include bankruptcy courts, have no jurisdiction to render advisory opinions. *In re Trichilo*, 540 B.R. 547, 551 (Bankr. M.D. Pa. 2015).

At this juncture, any opinion rendered by this Court would be merely advisory.

---

[25] To the extent that the Movants request that the confirmed plan be *modified* to provide for an allocation of payments between the SBA and Non-SBA portions of the secured claim, it would be procedurally improper to file an adversary proceeding. To modify a confirmed Chapter 11 plan, the proponent must comply with § 1127, which provides that "[s]uch plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title." 11 U.S.C. § 1127(b). Section 1127(c) further requires that the proponent comply with § 1125, which may require additional disclosure and solicitation regarding the proposed modification. *See In re Boylan Int'l, Ltd.*, 452 B.R. 43, 47-52 (Bankr. S.D.N.Y. 2011).

Since confirmation, the Debtor has made all of its scheduled plan payments to Heritage Bank and to its successor, Renasant Bank. There is no dispute that the unsecured claim has been paid in full and that the Debtor continues to make monthly payments on the secured claim. According to Mr. Blackwell's testimony at the August 21, 2019 hearing, Renasant Bank and its predecessor have accepted these payments and applied them to the outstanding balance. As Mr. Blackwell testified, no demand letter has been sent attempting to recover from the Debtor amounts other than those specified in the Consent Order. (Tr. at p. 114). Nor has there been any attempt to foreclose on any of the collateral. (Tr. at p. 114). Mr. Blackwell further testified that once the debt is repaid, Renasant Bank fully intends to release all of its collateral. (Tr. at p. 93). With nothing to interpret and no adverse action taken against the Debtor by Renasant Bank, there is no justiciable case or controversy between the parties on which this Court could rule. The Movants seek an impermissible advisory opinion that could be used to influence the adjudication of the Civil Action in their favor.

Other courts have reached the same conclusion in similar circumstances. For example, in *In re Cubic Energy, Inc.*, 587 B.R. 849 (Bankr. D. Del. 2018),[26] the bankruptcy court confirmed a Chapter 11 plan that included provisions concerning the release, discharge, and injunction of certain claims and causes of action. Various parties subsequently filed a motion seeking the court's interpretation of whether those provisions applied to bar potential claims by the liquidating trustee against the movants relating to a state court judgment. The court denied the motion because the liquidating trustee had not filed any action against the

---

[26] *Cubic* did not involve a motion to reopen pursuant to § 350(b).

movants, and therefore to interpret the confirmed plan at that stage "would be to indulge in appraising a 'hypothetical set of facts.'"[27] *Id.* at 857 (quoting *In re Lazy Days' RV Ctr., Inc.*, 724 F.3d 418, 421 (3d Cir. 2013)). The same is true in this case, where Renasant Bank has taken no action adverse to the Debtor.

Similarly, in *Zisholtz v. Goldstein (In re Martin's Aquarium, Inc.)*, 98 F. App'x 911 (3d Cir. 2004) (unpublished decision), the Third Circuit vacated the district court's order affirming the bankruptcy court's decision to reopen a Chapter 7 case. There, the bankruptcy court approved a settlement entered into by the trustee, the creditors, and the debtor's owners before the case was closed. Subsequently, when state court litigation among the parties was pending, the creditors requested that the bankruptcy court reopen the case "for the limited 'sole' purpose of giving an opinion regarding the effect" of the settlement order. As the Third Circuit explained, it appeared that the creditors "were dissatisfied with the initial interpretation of [the settlement order] taken by the . . . state courts and sought therefore to enlist . . . the Bankruptcy Court to aid their arguments in the state litigation." *Id.* at 913. The Third Circuit concluded that the creditors sought an advisory opinion, which "was not a proper basis to reopen proceedings in bankruptcy court." *Id.*

Admittedly, in a subsequent published decision, the Third Circuit distinguished *Martin's Aquarium*, concluding that an opinion is not necessarily advisory simply because the movant seeks to use the opinion to impact state court proceedings. *In re Lazy Days' RV*

---

[27] The court in *Cubic* stated that "[w]hile the dispute may fall within the scope of the Court's power at some point in the future, it does not fall within its jurisdiction today." *Id.* at 857.

*Ctr., Inc.*, 724 F.3d 418, 421 (3d Cir. 2013). In *Lazy Days*, the bankruptcy court confirmed a Chapter 11 plan and closed the case. Subsequently, after various lawsuits were filed in state court, the reorganized debtors moved to reopen the case, seeking a ruling that a lease's anti-assignment provision was unenforceable. The bankruptcy court granted the relief sought, but the district court reversed on the basis that the bankruptcy court's order was an advisory opinion directed at the state courts. The Third Circuit reversed the district court on the grounds that the bankruptcy court's order "actually invalidated the anti-assignment clause and ordered the parties to do something," and thus it affected the rights of the litigants. *Id.* at 421-22. The facts of the instant case, however, are closer to those in *Martin's Aquarium* than those in *Lazy Days*. The Movants seek to reopen the bankruptcy case for this Court to "interpret" orders for which there is nothing to be interpreted; such interpretation would have "no legal effect" and thus would be "merely advisory." *Id.* at 422. The Court declines to render such an impermissible advisory opinion.

## XV. Conclusion

For these reasons, the Court finds that Renasant Bank and Hall & Navarro have failed to carry their burden of showing sufficient cause to reopen the Debtor's Chapter 11 case at this time. Therefore, the Court will exercise its discretion under § 350(b) to DENY the Motion to Reopen. (Dckt. 137). Nevertheless, given the limited, preliminary nature of the evidence presented at the August 21, 2019 hearing, it remains possible that the Movants could show sufficient cause at some future time. Moreover, the District Court, if it chooses to exercise jurisdiction, might refer some aspect of the Civil Action to this Court. Therefore,

the Court's denial of the Motion to Reopen is WITHOUT PREJUDICE. A separate Order will be entered consistent with this Opinion.

Dated at Savannah, Georgia, this 21st day of November, 2019.

Edward J. Coleman, III, Chief Judge
United States Bankruptcy Court
Southern District of Georgia

34